UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO.:        2:16-cv-163 (WOB-CJS)

MELISSA & DONALD COVINGTON JR.                              PLAINTIFFS

VS.                    **MEMORANDUM OPINION AND ORDER**

BOONE COUNTY, KY ET. AL.                                    DEFENDANTS

## I.     INTRODUCTION

This action is brought under 42 U.S.C. § 1983 for alleged Fourth Amendment excessive force and false arrest violations. Melissa and Donald Covington Jr. ("Melissa", "Covington Jr.", or collectively "Plaintiffs") allege that Boone County deputy Jonathan Ball ("Ball") failed to intervene to protect Plaintiffs' constitutional rights when fellow deputies Wesley Mackey ("Mackey") and Tyler Brockman ("Brockman") arrested them for disorderly conduct and resisting arrest for protesting Donald Covington III ("Covington III")'s arrest on two outstanding bench warrants. The matter is before this Court on Defendants' summary judgment motion solely related to Ball's actions. Having previously heard oral argument on this motion, the Court now issues the following memorandum opinion and order.

## II.    FACTUAL & PROCEDURAL BACKGROUND

On February 26, 2016 at approximately 11:15 PM, Boone County deputies Ball, Mackey, and Brockman were preparing to serve two bench warrants for unpaid fines on Covington III at Plaintiffs' Florence, Kentucky residence. (Doc. 29, PageID# 117; Doc. 31, PageID# 193; Doc. 34,

1

PageID# 298; Doc. 38-1, PageID# 411.) Typically, Boone County only requires two deputies to serve a warrant, but Ball had requested that Brockman accompany them with a canine unit. (Doc. 31 at 193.) Ball explained to Mackey that he had been involved in a prior 2015 arrest involving Covington III where he had attempted to flee the crime scene on foot before capture. (Doc. 32 at 229; Doc. 38-2, PageID# 415-16.) The canine's presence would ensure that a similar flight would not occur in this instance. (Doc. 33 at 265.)

With all law enforcement parties present, the deputies departed their staging area and arrived at Plaintiffs' home one block away. (Doc. 31 at 193.) The deputies' plan involved Ball and Mackey directly engaging Covington III at the home's entrance while Brockman took up position along the side of the residence closer to its rear. (Doc. 33 at 265.) Ball then proceeded to knock on Plaintiffs' door with Mackey positioned directly next to him. (Doc. 31 at 196.)

The knock alerted Melissa and Covington III to the deputies' presence. (Doc. 29 at 134; Doc. 34 at 296.) Melissa answered and asked Ball for clarification regarding which "Donald Covington" they sought. (Doc. 29 at 136.) Ball improperly responded that the warrants concerned Covington Jr. (Doc. 34 at 297.) Melissa indicated to both deputies that their information did not make sense as Covington Jr. had no pending charges against him, but she insisted on waking her husband for clarification and returned inside the residence. (Doc. 29 at 136, 138.) The deputies then proceeded to clarify that the subject of both warrants was Covington III.[1]

Melissa pressed both deputies to show her the actual warrants and asked about the specific charges leveled against Covington Jr., but they declined. (*Id.* at 136.) An unspecified deputy

---

[1] Melissa's deposition asserts that Mackey radioed dispatch to clarify the subject's birthdate while Mackey contends that Ball informed him that there were, in fact, multiple male Covingtons with the same name. (Doc. 29 at 136; Doc. 32 at 230.)

further responded that both warrants were for fleeing arrest and assault to which Melissa argued again that a mistake had occurred since Covington III had already completed his sentence for those crimes. (*Id.*) Hearing the exchange between Melissa and the deputies and being visually identified by Brockman, Covington III exited the residence and approached Ball moving away from the front porch. (Doc. 34 at 297.) Ball remained facing the front of the house as Covington III neared. (Doc. 31 at 200.)

At this point, Ball and Covington III exchanged pleasantries and Ball asked if Covington III had a license for identification purposes and began confirming the warrants with dispatch via radio. (Doc. 31 at 198; Doc. 34 at 302.) While awaiting confirmation, Covington III allegedly began to yell and scream for his neighbor, David Dehner ("Dehner"), to come outside and videotape the deputies' conduct towards Melissa and Covington Jr., who had joined his wife by their front door. (Doc. 31 at 198; Doc. 38-4, PageID# 428.) Ball allegedly warned Covington III to stop yelling and screaming or he would face a disorderly conduct charge and be placed under arrest. When Covington III refused to comply, Ball placed him under arrest in handcuffs. (Doc. 31 at 198; Doc. 34 at 305.)

At the front door, Plaintiffs continued to seek clarity from Mackey regarding the unfolding situation. Melissa allegedly became agitated over the sight of Covington III in handcuffs and was warned by Mackey to return fully inside the house. (Doc. 32 at 231.) Melissa declined to do so and allegedly began to violate Mackey's "personal space" inching closer to him in the doorway. (*Id.*) At this juncture, Mackey glanced at Brockman, who had repositioned himself at the front of the house, for further guidance. (*Id.*) Brockman advised Mackey to arrest Melissa on the rationale that she was about to interfere with Covington III's arrest. (Doc. 32 at 231; Doc. 33 at 266.) As

3

Melissa stepped out of the doorway, Mackey allegedly grabbed her by the arm and twisted it before or while applying handcuffs. (Doc. 29 at 142.)

Melissa's arrest catalyzed Covington Jr. to continue to ask why Brockman and Mackey were now arresting his wife. (Doc. 30, PageID# 172.) Covington Jr. began to question Brockman and Mackey's maturity which led Mackey to attempt to grab him while he was still positioned in his house. (*Id.*) Covington Jr. moved backwards in response. (*Id.*) His reaction caused Mackey to reach for his gun while Covington Jr. allegedly asked Mackey if Mackey was going to shoot him in his own home. (*Id.*) Mackey then pulled Covington Jr. out of his home and placed him in handcuffs. (*Id.*)

According to the record, Ball's position during these events remained static with him facing the front of Plaintiffs' home with Covington III in handcuffs. (Doc. 31 at 200.) He does not recall Plaintiffs' positioning relative to Brockman and Mackey or the substance of their conversations. (*Id.* at 201.) He only testifies to the fact that throughout Plaintiffs' exchange with Mackey and Brockman, Covington III continued to yell at a neighbor to videotape the events and for Mackey and Brockman to leave his parents alone. (Doc. 31 at 202; Doc. 34 at 305.) From Ball's perspective, the entire situation unfolded in minutes. (Doc. 31 at 203.)

The deputies then began to move Plaintiffs and Covington III to their respective cruisers. Ball placed Covington III in his cruiser as Dehner continued to record the event, but Ball does not recall which deputy transported Plaintiffs in theirs. (Doc. 31 at 202.) Covington III then proceeded to ask Ball to speak to the deputies' superior. (Doc. 34 at 307.) As the officer-in-charge, Brockman approached Ball's cruiser, but was rebuffed by Covington III who desired to speak to a lieutenant or other higher ranking officer. (*Id.*)

Ball transported Covington III to the police station and began composing his citation. (Doc. 31 at 203.) Ultimately, Covington III was charged with second-degree disorderly conduct. (*Id.* at 206.) While Ball composed Covington III's citation, Plaintiffs spoke to Lieutenant Christopher Hall ("Hall") and tried to explain to him that a mistake had been made concerning their arrests, but Hall ultimately decided not to overturn the arrests. (Doc. 29 at 148.) Covington III was released on bond a few hours later while Plaintiffs were released the following day. (Doc. 30 at 178; Doc. 34 at 311.)

On March 24, 2016, Covington III entered a guilty plea for the second-degree disorderly conduct charge that involved no jail time, but would increase his probationary period from 335 to 360 days. (Doc. 34 at 312.) Plaintiffs agreed to participate in a diversion program in exchange for their guilty pleas. (*Id.*) Following the conclusion of the state criminal action, Plaintiffs brought this federal suit for excessive force and false arrest under 42 U.S.C. § 1983 in September 2016 seeking unspecified compensatory and punitive damages against the deputies in their individual and official capacities. (Doc. 1.) Plaintiffs also brought state assault, battery, and false imprisonment charges, but have dropped them as they relate to Ball. (Doc 1; Doc. 38, PageID# 409.) Following discovery, Defendant has now moved for summary judgment, again, only regarding Ball's actions vis a vis Plaintiffs' arrests.

## III. LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a summary judgment motion, courts are compelled to view the evidence and draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party possesses the burden of showing the absence of any genuine issues of material fact." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once this burden is satisfied, the non-moving party must produce specific facts demonstrating that a genuine fact issue remains. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000). If a rational fact finder could not find in the non-moving party's favor after reviewing the record's entirety, summary judgment should be granted. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

IV. **ANALYSIS**

Section 1983 provides a federal cause of action regarding the deprivation of "any rights, privileges or immunities secured by the Constitution and law" including the Fourth Amendment. 42 U.S.C. § 1983. However, state actors sued under this statute are generally afforded qualified immunity meaning that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

To withstand a summary judgment motion where, as here, Defendants have asserted a qualified immunity defense, a plaintiff must satisfy two elements. First, they must show from the facts alleged that the government official violated a clearly-established statutory or constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Second, they must demonstrate whether the right violated was clearly-established such "that a reasonable officer would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Federal courts may address these elements in any order. *Pearson*, 555 U.S. at 236.

1. **Excessive Force**

    a. Lack of Constitutional Violation

This case implicates a particular species of Section 1983 excessive force actions where a law enforcement official is alleged to have failed to intervene in a potentially unconstitutional force application by his fellow officers. In general, mere presence at the scene of a search, without a showing of direct responsibility for the alleged use of excessive force, will not expose an officer to liability. *Ghandi v. Police Dep't of the City of Detroit*, 747 F.2d 338, 352 (6th Cir. 1984). However, the Sixth Circuit has recognized an "inaction theory" of excessive force liability. *See Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) ("[I]t is *not* necessary, in order to hold a police officer liable under Section 1983, to demonstrate that the officer actively participated in striking a plaintiff.") (emphasis added). Under this theory, a law enforcement official may be held liable in failing to act to prevent an excessive force application when "(1) the officer observed or had reason to know that the excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Since the latter element is dispositive, the Court addresses it first keeping in mind some broader principles concerning an asserted qualified immunity defense in a Section 1983 action. Particularly, the Supreme Court has, twice this very term, reinforced the considerable deference given to law enforcement officials in this context. *E.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018); *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). Both cases reaffirmed the highly fact-driven analysis that is applied from the perspective of a reasonable law enforcement official to determine whether liability attaches. (*Id.*) Put succinctly, "'this demanding standard protects all but the

plainly incompetent or those who knowingly violate the law.'" *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Examining the means and opportunity element from this perspective in light of the evidentiary record indicates that Ball did not possess either to prevent Plaintiffs' arrests. The record is rife with testimony that Ball's responsibilities following Covington III's exit from Plaintiffs' home were to supervise Covington III and monitor the unfolding situation regarding Dehner's act of recording the event on his cell phone. Covington Jr. testified that when he arrived at the front door Ball "was looking at [him], and across the street, and back and forth." (Doc. 30 at 171.) Likewise, Melissa indicated that Covington III and Ball were talking throughout her interactions with Mackey and Brockman. (Doc. 29 at 142.) In fact, Ball was the sole deputy in charge of quieting Covington III as he allegedly began to shout for Dehner to come out of his neighboring house and begin recording the event. (Doc. 31 at 202; Doc. 34 at 305.) Such evidence remains consistent with Ball's testimony that he was "concentrating on [Covington III]" throughout these events. (Doc. 31 at 200.) The situation, itself, also remained tenuous with Dehner moving closer to the deputies to record the events. (Doc. 38-4 at 430.)

Fellow district courts both within and outside of this Circuit have granted qualified immunity where, as here, a law enforcement official's attention is diverted from the application of alleged excessive force by developing circumstances. *Phelps v. Coy*, 164 F. Supp. 2d 961, 965, 974 (S.D. Ohio, 2000), granted qualified immunity to an officer who confronted an arrestee who moved towards an altercation between the officer's partner and another arrestee where alleged excessive force was applied on the grounds that the intervening officer could not have possessed the opportunity or means to do so. Likewise, in *Dawson v. Brown*, No. 12-3330, 2015 WL 859451, at *6 (C.D. Ill. Feb. 26, 2015), a district court granted summary judgment and qualified immunity

to an observing officer who was attempting to subdue another suspect while his colleagues allegedly engaged in a false arrest and applied excessive force. The rationale for doing so remained that "no jury could find an officer who was preoccupied with apprehending another individual could be liable for failure to intervene under these circumstances." *Id.* at *5.

Similar diversion abounds in this case. Here, Ball's concentration focused on quelling Covington III's alleged shouting, monitoring Dehner's recording, and ensuring that Covington III did not flee as he had done during a prior arrest. This evidence strains logic that any factfinder would determine that Ball should have abandoned Covington III to assess and intervene in a possible excessive force application involving his colleagues and would undercut the substantial deference afforded to law enforcement officials to make split-second strategic judgments in these unsettled situations. Since the record remains devoid of any evidence that Ball could have successfully abandoned Covington III to intervene with Mackey and Brockman's arrest of Plaintiffs in a way that did not compromise safety, a summary judgment grant and qualified immunity award is appropriate here.

Assuming for argument's sake that Plaintiffs could demonstrate that Ball possessed the means to intervene in this instance, summary judgment also remains proper under the inaction theory's observation element. In guiding lower courts, the Sixth Circuit has emphasized repeatedly that examining the event in question's temporality remains the analytical lodestar since temporality correlates directly to a law enforcement officer's ability to identify an opportunity to intervene and develop a means to do so. Indeed, case law is unambiguous that where an alleged instance of excessive force lasts for a matter of seconds, officers possess no opportunity to intercede and cannot be held liable for failing to prevent any violation. *See e.g.*, *Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (determining that an officer possessed no opportunity to

9

prevent two blows to a plaintiff's head because the duration for intervention "could not have been more than a few seconds"); *Wells v. City of Dearborn*, 538 F. App'x 631, 640 (6th Cir. 2013) (holding that no opportunity to prevent a knee strike and tasing existed where the acts were "rapid"); *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (concluding that no opportunity existed to prevent a "takedown" where the event's duration was no more than ten seconds); *Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (holding that no opportunity to intervene arose to stop a tasing that "could only have lasted for a fraction" of the entire altercation with law enforcement that lasted mere minutes).

Here, the record is replete with descriptions of Plaintiffs' arrests as occurring within a rapid timeframe that would align with the above holdings. A quick overview proves this point. Ball testified that the entire event "was quick. It wasn't drug [sic] out" and that he was "concentrating on [Covington III]" throughout. (Doc. 31 at 203, 209.) Likewise, Plaintiffs' own testimony confirms that their arrests happened very quickly. Melissa indicated that "as soon as [she] stepped onto the front porch, Officer Mackey grabbed [her] right wrist." (Doc. 29 at 141.) Likewise, Covington Jr. asserted that Mackey "grabbed [him] [and] started to pull [him] out of [his] house." (Doc. 30 at 172.) Mackey also described the situation as "fairly chaotic." (Doc. 32 at 231.) Such descriptions demonstrate that the alleged excessive force incident transpired within seconds to minutes and comport with case law involving similar factual situations where the excessive force application occurred rapidly in unsettled circumstances.

Plaintiffs argue that the use of force report points to a much longer application of excessive force due to the event's total duration which lasted approximately thirty minutes. (Doc 38-5, PageID# 478.) From this perspective, Plaintiffs maintain that Ball would have had sufficient time to react to the unfolding situation surrounding Plaintiffs' arrests. (Doc. 38 at 402-03.) This

argument is unavailing. While the Sixth Circuit has recognized a duty to intervene where the underlying excessive force application spanned a sufficient time period, courts do not look to the event's entire duration but only to the application of alleged excessive force itself to determine whether law enforcement possessed adequate time to react. *See e.g.*, *Durham v. Nu'man*, 97 F.3d 862, 868 (6th Cir. 1996) (reversing a summary judgment grant where a beating "lasted approximately ten minutes" and the defendant nurse "watched the beating unfold on her monitor from the nurse's station, and then from the doorway of . . . the room where the beating took place"), *cert. denied*, 520 U.S. 1157 (1997). Consistent with the record, Plaintiffs' arrests occurred within a matter of seconds to minutes precluding Ball from interfering with this event and entitling him to qualified immunity.

### b. Lack of a Clearly-Established Right

Because the Court holds that Ball's lack of intervention did not run afoul of Plaintiffs' Fourth Amendment right to be free from the use of excessive force, the question of whether this alleged right was clearly-established becomes irrelevant. *See Tony L., et. al v. Childers, et. al.*, 71 F.3d 1182, 1184 (6th Cir. 1995) (declining to address the clearly-established element of a qualified immunity defense in a Section 1983 action where no constitutional violation was present); *see also Tallman v. Elizabethtown Police Dep't*, 344 F. Supp. 2d 992, 995 (W.D. Ky. 2004) (applying same principle in a Fourth Amendment excessive force context). The Court, therefore, need not address this component of the qualified immunity analysis regarding Plaintiffs' Fourth Amendment excessive force claim.

### 2. False Arrest

Plaintiffs' false arrest claims against Ball for an alleged failure to intervene also fail under the same rationale as their excessive force counterparts. The Supreme Court has not directly held that law enforcement liability may attach for a failure to intervene outside of the excessive force context. The Sixth Circuit, however, has indirectly established a basis for bringing failure to intervene claims outside of this context. In *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973) (per curiam), the appellate court did not include qualifying language to the excessive force context in outlining the scope of law enforcement liability in a Section 1983 action. Under its rationale:

> a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal laws. Acts of omission are actionable in this context to the same extent as are acts of commission.

*Id.* at 36-37.

Furthermore in *Jacobs v. Vill. of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001), the Sixth Circuit went on to cite to a Second Circuit holding in *Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994), which found that an officer who fails to intervene is liable for the acts of fellow officers where that officer observes or has reason to know that a citizen was, among other things, unjustifiably arrested.

At least three district courts within this Circuit have adopted *Smith* and *Anderson's* expanded theory of liability and applied it to the false arrest context. *E.g.*, *Bunkley v. City of Detroit*, 16-cv-11593, 2017 WL 4005919, at *4 (E.D. Mich. September 12, 2017); *Holloran v. Duncan*, 92 F. Supp. 3d 774, 795 (W.D. Tenn. 2015); *Kaylor v. Rankin*, 356 F. Supp. 2d 839, 850-51 (N.D. Ohio 2005). In doing so, they have applied *Turner's* analytical framework or a close analogue for failure to intervene in the excessive force context. *See Rankin*, 356 F. Supp. 2d at

850 (applying *Anderson's* mandate that an officer must have had a realistic opportunity to intervene to prevent an alleged constitutional violation).

Here, an application of *Turner's* framework precludes Plaintiffs from carrying the day for the exact same reasons as in the excessive force context. Again, the evidence is such that no rational factfinder would determine that Ball possessed the means and opportunity to intervene to stop Plaintiffs' arrests in an unsettled situation involving an arrestee with a flight-risk history and which transpired in a matter of seconds. As there is no constitutional violation for failure to intervene to prevent a false arrest in this matter, the right to do so also cannot be clearly-established. *See Tallman*, 344 F. Supp. 2d at 995. Defendants are entitled to summary judgment and qualified immunity on Plaintiffs' false arrest claim.

## V. CONCLUSION

For the reasons stated therein, it is **ORDERED** that:

> Defendant Jonathan Ball's motion for summary judgment (Doc. 28.) be, and is hereby **GRANTED**.

This 7th Day of June, 2018.



Signed By:
*William O. Bertelsman* WOB
United States District Judge